UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | No. 1:10-cr-16 |
| v. | ) | |
| | ) | *Mattice / Lee* |
| JACKIE C. CAMPBELL | ) | |

**REPORT AND RECOMMENDATION**

Before the Court is the motion of Defendant Jackie C. Campbell ("Defendant") to suppress drugs seized from his vehicle after a traffic stop and search performed on January 20, 2010, as well as inculpatory statements he later made regarding the drugs [Doc. 17].[1] Defendant concedes the traffic stop was lawful, but contends his detention was unreasonably prolonged. After considering the evidence and argument, I find no constitutional violation and **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

**I.   BACKGROUND**

At the hearing, the Government offered the testimony of Chattanooga Police Department ("CPD") Officer Jason Duggan ("Duggan"), who is a canine handler for the Special Investigations Unit and has been assigned to the Highway Interdiction Team for the last two years of his five-year employment with CPD. Duggan was the only witness at the hearing, and I **FIND** his testimony, which was not impeached, to be entirely credible. Duggan testified as follows:[2]

---

[1] The motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 18]. The Government filed a response in opposition [Doc. 21] and an evidentiary hearing was held on May 11, 2010. The matter is now ripe for decision.

[2] While testifying, Duggan refreshed his memory with his own police report. That report was prepared after the traffic stop with the aid of a DVD recording from Duggan's patrol car camera. Both the report and the DVD recording were introduced into evidence, but neither party requested that the Court review the DVD and it was not played during the hearing. The parties indicated the officer's testimony about the timeline of events discussed herein was consistent with the DVD.

At 9:04 p.m. on the evening of January 20, 2010, Duggan observed Defendant's vehicle overtake another vehicle. It had been raining heavily and the roads were wet. Duggan's radar showed Defendant was traveling ten miles over the speed limit, so Duggan initiated a traffic stop at 9:05. Defendant was alone in the car, and Duggan approached the car from the passenger's side for safety reasons. Defendant had lowered the window, and Duggan was "overtaken" by the smell of air freshener when he approached the vehicle. Duggan observed two air freshener "trees" hanging from Defendant's steering column, but he did not believe they could have created such a strong smell. In Duggan's experience, strong air fresheners are often used to mask the smell of narcotics, guarding against detection by police officers and drug-sniffing dogs. Duggan commented to Defendant that "you got it smelling good in here," and Defendant lowered the two rear windows of the car slightly in response.

Duggan also noted that Defendant appeared very nervous, patting his legs. Duggan told Defendant why he had been pulled over and asked him for his license and registration. Defendant already had his registration out, which Duggan found to be unusual, but Defendant had difficulty retrieving his license from his billfold, and his hands were trembling as he handed the documents to Duggan. Duggan stated Defendant appeared "abnormally" nervous for someone who had been stopped for a traffic violation.

Duggan returned to the patrol car at 9:07 and began to review Defendant's documents. Defendant's proof of insurance appeared valid and his registration showed the vehicle belonged to him. At 9:08, Duggan telephoned the Blue Lightning Operations Center ("BLOC") to ascertain whether Defendant had any outstanding warrants or a criminal history. At 9:09, Duggan asked Defendant to exit his vehicle and accompany Duggan back to the patrol car so that he could issue

a warning citation. Duggan told Defendant that he was going to issue a warning that would not go on his driving record. The purpose of this colloquy, Duggan explained, was to allay any nervousness Defendant might have been experiencing due solely to the traffic stop. Defendant remained nervous, however, despite this information.

At 9:11, Duggan's phone rang. The BLOC dispatcher informed Duggan of an "officer safety alert" on Defendant. The dispatcher had not completed the records check, but had interrupted her usual procedures to notify Duggan that Defendant had previously fled from police in Tennessee. On that previous occasion, Defendant had been pulled over while traveling from Atlanta, Georgia, to West Virginia, when he fled on foot. Five pounds of marijuana were later found in his vehicle. Duggan did not want Defendant to flee, so to avoid "spooking" him, Duggan falsely told him his records check had come back clean (i.e., that he had no warrants), but that checking his driver's license would take a while longer. In reality, the records check had not been completed. Defendant appeared to be cold, so Duggan instructed him to get his coat. At 9:12, while Defendant was at his vehicle getting the coat, Duggan discreetly radioed for backup. Defendant returned wearing a bulky jacket, and with his permission, Duggan patted down the jacket for weapons and found none. While conversing with Duggan, Defendant stated he had been in Atlanta visiting his mother and was returning to West Virginia. Duggan found this significant because it was the same route Defendant had previously used to transport marijuana.

At 9:14, Officer Curvin arrived on the scene. At the same time, BLOC called with the results of the records check. The phone call from BLOC lasted about three minutes. Defendant did not have any warrants and his license was valid, but he did have a criminal record: two felony convictions, a multi-state offender, and charges for carrying concealed weapons and large quantities

3

of narcotics. Defendant began to look around a lot and he asked what county he was in and the name of a shopping mall that was within sight. Duggan theorized that Defendant might have been considering flight and gathering information he could convey to whoever would pick him up. Duggan had already completed most of the warning citation, but he suspected Defendant was involved in some sort of criminal activity and decided to slow down, meaning he would take time to be thorough and ask more questions and not rush to finish the citation. At 9:19, Duggan asked Defendant about having fled from police in the past, which Defendant acknowledged as a "mistake," and Duggan also asked a series of standard questions about whether Defendant had narcotics, packages, or cash in his car. Defendant denied having any such items. Duggan also asked for consent to search, which Defendant refused to give.

The warning citation was still not completed, so Duggan handed it off to Officer Curvin to finish. The citation was ultimately issued, but the record does not reveal *when* it was issued. Meanwhile, Duggan retrieved his drug-detection canine, Red, from the patrol car. At 9:21, Red began his first "free sweep" around the car. Red normally runs around a car without breaking stride, but on this occasion, he broke stride twice--once at the driver's door, where he stopped and turned around, and again at the passenger's door. Because of these breaks in stride during the first pass, Duggan guided Red through a directed pass/detailed sniff around the vehicle. During the detailed sniff of the vehicle, Red gave abnormal odor responses indicating the presence of contraband giving rise to the search of the vehicle. Although different dogs indicate differently, Red indicates by pawing or scratching. On the detailed sniff, Red did just that. He snorted at the driver's door

4

handle, suggesting he was trying to pinpoint the contraband odor, and then he scratched at the door.[3]

Duggan proceeded to search the car. The initial search revealed no contraband, but did reveal two bottles of liquid air freshener called "Blunt Power." Defendant's glove box was locked and Defendant did not have a key. Defendant stated the glove box was broken and he had never opened it before. Although he wanted to complete his search, Duggan did not want to needlessly break the glove box. Consequently, at 9:57, he deployed Red inside the car. Red is not accustomed to working inside cars (although he has done it twice previously), and it took some time to calm him down. Red then indicated by pawing at the vent near the glove box. Duggan pried a corner of the glove box open and retrieved some papers with Defendant's address on them. At that point, Duggan knew Defendant lied about never having opened the glove box, so at 10:13, he pried the glove box open further and found a bag with crack cocaine and ecstasy pills, along with four more unopened air freshener "trees."

## II. ANALYSIS

Defendant seeks to suppress the drugs (as well statements he later made), arguing that his detention was unreasonably prolonged. Although Defendant concedes that Duggan was justified in stopping him for speeding, a traffic stop that is lawful at its inception may nonetheless violate the Fourth Amendment if it is not properly limited in scope and duration. *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010). The reasonableness of both the scope and duration of a traffic stop

---

[3] Defendant does not challenge the certification, qualifications or reliability of Red or Duggan as his handler, nor does he contest that Red's indication during the detailed sniff created probable cause to search the vehicle, including the locked glove box. Instead, he argues Red's deployment was improper because it was the product of an improperly prolonged detention, and the deployment itself further prolonged that detention.

is controlled by the quantum of articulable suspicion supporting the stop: "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," and the stop "must last no longer than is necessary to effectuate the purpose of the stop." *Id.* at 488-89 (internal quotations and alterations omitted).

The Sixth Circuit Court of Appeals ("Sixth Circuit") recently explained that there are two species of "prolongation" cases--those in which the purposes of the initial stop have actually been completed, in which case any *subsequent* detention is impermissible without independent reasonable suspicion, and those in which there is some prolongation *before* the stop is completed because the officer is pursuing parallel investigative purposes unrelated to the traffic violation. *Id.* at 492 n.9. In the latter case, the officer may pursue those other avenues of investigation so long as the detention is not "measurably" prolonged beyond the time necessary to complete the purposes of the stop. *Arizona v. Johnson*, 129 S.Ct. 781, 788 (2009).

If there is "dead time" while the officer or her partner is completing a task related to the traffic violation, the officer may ask unrelated questions without fear of prolonging the stop. *See Everett*, 601 F.3d at 492. Even if the stop is prolonged, the extended detention will not necessarily be unreasonable. *Id.* at 493. "[S]ome" prolongation, however, becomes "too much" when the "'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole*--including any prolongation due to suspicionless unrelated questioning--was [un]reasonable." *Id.* at 493-94 (citing cases from other circuits in which delays between 25 seconds and five minutes were approved as not measurably extending the stop and a contrasting case in which a delay of 13 minutes was held to be unreasonable, but declining to adopt a bright-line test).

The "overarching consideration" in this inquiry is the officer's "diligence" in (a)

6

"ascertaining whether the suspected traffic violation occurred" and (b) "if necessary, issuing a ticket." *Id.* at 494. "[C]ontext-framing" inquiries related to the driver's travel history and travel plans or his authority to operate the vehicle "will rarely suggest a lack of diligence." *Id.* Similarly, inquiring whether the driver possesses a weapon "do[es] not bespeak a lack of diligence." *Id.* at 495. In contrast, if the officer "definitively abandon[s] the prosecution of the traffic stop and embark[s] on another sustained course of investigation, this . . . surely bespeak[s] a lack of diligence." *Id.* In such a case, of course, the detention is unreasonable unless the other sustained course of investigation is supported by independent reasonable suspicion. *See id.* at 488 n.4, 495 "Abandonment" in this context is not a subjective inquiry: "continuing to detain a motorist does not become unlawful just because the officer has determined in his own mind not to pursue the traffic violation" or because no citation is ultimately issued. *United States v. Herbin*, 343 F.3d 807, 810 (6th Cir. 2003).

While the *Everett* court's opinion dealt only with *questioning* about matters unrelated to a traffic stop, its reasoning applies with equal force to canine sniffs. "[M]ere questioning" about unrelated investigative purposes is not a "seizure" and it does not trigger the protections of the Fourth Amendment. Questioning is justified by the principles applicable to consensual encounters, and it is therefore objectionable only if it unreasonably extends the duration of a separate seizure. *Muehler v. Mena*, 544 U.S. 93, 101 (2005); *Everett*, 601 F.3d at 496. Similarly, a canine sniff does not trigger the protections of the Fourth Amendment. *See Muehler*, 544 U.S. at 101 (canine sniff is "not a search"). Thus, like questioning, a canine sniff is unreasonable only if it unreasonably extends the duration of the stop. *See Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005); *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009).

7

In summary, *Everett* establishes a simple framework for prolongation cases: if the traffic stop is "completed" or "definitively abandon[ed]," the officer must have independent reasonable suspicion supporting any further detention at the moment of completion or abandonment. *See United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008). On the other hand, if the officer continues to pursue the purposes of the original traffic stop throughout the encounter, a reviewing court must examine the totality of the circumstances to determine whether the duration of the stop as a whole, with due consideration to the time spent on unrelated inquiries (such as questioning or dog sniffs), was reasonable--in other words, whether the "bulk of the interaction" between the officer and the suspect was monopolized by the unrelated inquiry. *Everett*, 601 F.3d at 494, 495.

Defendant's detention is difficult to shoehorn into either of *Everett*'s analytical categories. Certainly, the entire stop lasted longer than necessary to issue a warning citation. Duggan admitted the citation was nearly completed at 9:19, when he decided to "slow down," and the search was still ongoing almost an hour later. Without knowing when the warning citation was actually issued, however, it is impossible to say when the traffic stop was completed. *See id.* at 494 (legitimate purposes of the traffic stop are ascertaining whether the offense occurred and, if necessary, issuing a ticket). Consequently, it would be speculative to make a finding whether the challenged prolongation occurred before or after the stop was completed. It is also unnecessary to make such a finding. Either way, Duggan had independent reasonable suspicion supporting his further investigation.

The earliest point in time at which Defendant may complain occurred at about 9:17, when Duggan had received the results of the BLOC records check. Until that point, I **FIND** Duggan had been diligently pursuing the original purpose of the traffic stop. *See United States v. Bradshaw*, 102

F.3d 204, 212 (6th Cir. 1996) (holding that "radio checks" are "well within the bounds of the initial stop."). Any unrelated inquiries before that time would have occurred in the "dead time" while Duggan was waiting on the record check, and as such could not have caused any prolongation. *See Everett*, 601 F.3d at 492.

Furthermore, by the time the record check was complete, Duggan had sufficient reason to conduct a further investigation. "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). A detention cannot be supported by an "ill-defined hunch," but instead requires "a particularized and objective basis for suspecting the particular person of criminal activity." *Bell*, 555 F.3d at 540 (internal quotations and alterations omitted). Still, this is a "minimal" burden. *United States v. Smith* ("*Smith II*"), 594 F.3d 530, 536 (6th Cir. 2010). In articulating the bases for suspicion, officers may rely on factors that are in themselves innocent, "so long as a sufficient degree of suspicion attaches to [the innocent] behavior." *United States v. Saez*, 111 F.3d 132, 1997 WL 176434, at *3 (6th Cir. 1997) (Table) (*citing United States v. Sokolow*, 490 U.S. 1, 10 (1989)). Furthermore, law enforcement officers are entitled to draw reasonable inferences from the facts in light of their training and experience, even when a lay observer's suspicions would not be aroused. *Smith II*, 594 F.3d at 537 (6th Cir. 2010).

Here, at the time the BLOC records check was completed, Duggan was able to articulate five factors supporting his suspicions: (1) the strong odor of air fresheners, which in Duggan's experience are often used to mask the odor of narcotics, and Defendant's response of opening the back windows upon Duggan's comment about the odor; (2) Defendant's nervousness and visible

9

shaking, which Duggan considered as abnormal for a traffic violation; (3) that Defendant, despite his extreme nervousness, had his registration and insurance information ready to hand to Duggan; (4) the information from BLOC that Defendant had previously fled from police in Tennessee while transporting drugs, had been convicted of two prior felonies and was a multi-state offender, and had been charged with weapons and drug offenses; and (5) Defendant's route, which was the same route he had previously used to transport marijuana.

Defendant protests that each of the above factors has an alternative, innocent explanation. The applicable "totality of the circumstances" test, however, forecloses this sort of "divide-and conquer analysis." *United States v. Arvisu*, 534 U.S. 266, 273-74 (2002). As in *Arvisu*, although each of the factors may have been innocent enough by itself, taken together, I find they "warranted further investigation." *Id.* (*quoting Terry v. Ohio*, 392 U.S. 1, 22 (1968)). The overwhelmingly strong odor of air fresheners in combination with the remaining factors justify the brief detention, because "it is frequently the case that such strong odors indicate criminal activity." *Saez*, 111 F.3d 132, 1997 WL 176434, at *3 (finding reasonable suspicion where there was a strong odor of air fresheners and another chemical and the officer noticed a raised floor in the van). *See also United States v. Rodriguez*, 2010 WL 955933, at *7 (W.D. Mich. 2010) (strong odor of air fresheners tipped the scale in favor of reasonable suspicion). Thus, I **CONCLUDE** that the factors, taken together, created a reasonable suspicion and justified extending Defendant's detention to confirm or dispel that suspicion.

Defendant also argues that Red's deployment around, and later inside, the car unreasonably prolonged the stop. First, with respect to the deployment of Red around the vehicle, my finding that the additional detention was supported by independent reasonable suspicion disposes of Defendant's

argument. Furthermore, Duggan diligently pursued the additional investigation by quickly deploying Red at 9:21.

Second, with respect to the deployment of Red inside the car, Red's "indication" by scratching at the driver's door of the vehicle provided probable cause to search for contraband. *See United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994). When officers have probable cause to believe that a car contains contraband, they may search the entire car and any containers within it that might contain the contraband. *Arizona v. Gant*, 129 S.Ct. 1710, 1721 (2009); *California v. Acevedo*, 500 U.S. 565, 580. Duggan therefore could have entered Defendant's glove compartment *without* first deploying Red inside the vehicle. That he did not shows he attempted to avoid damaging the glove box unnecessarily, as he testified. Red's second alert inside the car, of course, reinforced the probable cause to search the glove compartment.

Accordingly, I **CONCLUDE** the search of Defendant's car was reasonable, and I **RECOMMEND**[4] his motion to suppress [Doc. 17] be **DENIED**.

                                                                                    s/*Susan K. Lee*
                                                                                    SUSAN K. LEE
                                                                                   UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).